Case number 21-5275, N.S. individually and on behalf of all others similarly situated v. Robert A. Dixon, United States Marshal, District of Columbia Superior Court, in his official capacity, appellant. Ms. Feudum for the appellant, Mr. Gonen for the appellate. Good morning, your honors. Elissa Feudum on behalf of the appellant, the United States. The Attorney General acted well within his statutory authority when he delegated to the U.S. Marshals the powers and duties of immigration officers, including the power to briefly hold class members pursuant to a detainer and an administrative warrant. The district court's order to the contrary should be overturned and the injunction vacated because it violates USC-1252-F1 and incorrectly found the delegation to be unlawful. ICE relies upon cooperation from the U.S. Marshal Service to carry out its duties to arrest and detain certain removable noncitizens as directed by Congress under Sections 1226 and 1231 of the INA. Let me ask you, Ms. Feudum, if the Homeland Security Act transferred Immigration Arrest and Authority to the Secretary of Homeland Security, how is it that power could live on in the marshals under the authority of the Attorney General when the Attorney General no longer has the authority to delegate? Because the HSA contained a savings provision for completed actions and Congress defined completed actions and its definition was broad to include, I believe it said, all grants, orders, and privileges. It doesn't refer to delegations. It doesn't. You're relying, I take it, on the 2002 order, the 1996 order. Those are, as a formal matter, orders. But one typically thinks of an order as something that could be complete, a completed administrative action, whereas the nature of the delegation as you are relying on it is as something ongoing. So, for example, who are the marshals supervised by in the exercise of the authority that you contend they have under the 2002 order? The Attorney General? Well, as the Court noted, the immigration powers that were previously vested in the Attorney General were transferred to the Department of Homeland Security and the marshals are not a subcomponent agency of the Department of Homeland Security. So they're not supervised in this activity by the Secretary of Homeland Security? I wouldn't describe it as supervision, no. And they're not supervised in this role by the Attorney General because the Attorney General's authority has all rolled over to the Secretary of Homeland Security. Yeah, and I would say that it's not a function of supervision, but one of cooperation between ICE and the U.S. Marshals Service, which is a law enforcement agency, the oldest law enforcement agency in this country. And I would draw the Court's attention to the fact, I know you've focused on the word orders, but I would draw the Court's attention to the word grants and privileges, which are also preserved by the completed administrative actions. And I would submit to that the delegations are a grant and that they bestow upon the U.S. Marshals a privilege and that as a result, the HSA is not an impediment to the powers that were bestowed. Are you aware whether there are any other delegations of authority that were made before the 2003, before the Homeland Security Act that might similarly be grandfathered and be continuing? I'd have to look at that. I'm not aware off the top of my head. If there were, I would suspect that there probably are just by the time frame that we're talking about and the fact that this, your question would encompass, you know, decades of administrative action. My guess would be that there is, but I can't point. There's a delegation from the Attorney General to the Jack, isn't there? Yes, that's correct. Yeah, that would be an example. Thank you. Yes, I mean, I would have to imagine that the answer would be yes. I mean, I know that there was an argument made by my friends regarding if this delegation, you know, that I talked about this delegation with respect to the delegation to the deputy and whether it continues to live on in our position as we expressed in our papers is that there is a difference between a specific delegation which is governed by terms and a catch-all designation which says whatever powers I have, you have too. And I think that there is a distinction to be drawn between a delegation of such generality of whatever powers I have, you have too, and a specific delegation like the one we have here which encompasses specific terms. It's not your position. I mean, there wasn't an amicus pretrial, but I take it it's not your position that without the 2002 order and the 1996 order that the marshals are authorized to carry out the function that they carried out in this case. They're not authorized to detain people who have been released from a court. We did not appeal on that basis. And so I can see that we've waived those arguments here. I think we Did you make that argument in the district court? The argument was made at the district court, and I do think that the argument could still be made and that there is validity to the notion that the U.S. marshals have the authority pursuant to their enabling statutes to act upon these warrants. There's all sorts. I mean, there's retake warrants, there's parole warrants, there's military absconsion warrants, all of which are administrative warrants that the marshals have traditionally been able to execute upon for decades. And so I think there are arguments that can be made, but I will acknowledge that we did make a decision not to pursue that basis of appeal here. This is an unusual kind of warrant, and maybe the military warrants that you're talking about are also civil, but marshals typically don't have authority to execute non-criminal warrants. Is that correct? Well, I take your point that they're enabling statutes speak to their authority to arrest for felonies committed in their presence, as well as felonies for which certain felonies for which they have probable cause to believe were committed. But I think an argument could be made that absent a statute that specifically divests them of the power to cooperate with a fellow law enforcement agency such as ICE, particularly in view of other statutes which provide for cooperation with ICE and between law enforcement agencies, that there are arguments that could be made that notwithstanding the, I think it's section 566 that you're referring to, that notwithstanding that apparent limitation that a particular statement precluding the marshals from such cooperation that it would exist. But again, that's not an argument that we preserve for this appeal, so I don't make that argument here today. I mean, to the extent that the marshals are being treated under the delegation orders that you do rely on as, in effect, immigration officers, isn't there a further problem that immigration officers, and I think this is true when state officials are delegated under 566 or when to cooperate, I may be mixing up my authorities, but when there is a statute that says state officials can work with INS, isn't there a requirement that they also have training to be sort of de facto immigration officers? There's no assertion that there's been any training. Well, I think it's interesting because I think the section that you're referring to is 1357 G2 as well as G10, and I will note that I was rereading my reply brief in this case and I miscited the statute as I think 1101 in one instance, so apologies for that, but I believe that that's the statute you're referring to. Thank you. And I think there's two points to be made here. On the one hand, you have section G2, which says that when there is a contract-like agreement between state officials and the federal government for state officials to act in a contractual capacity as immigration officers, they have to have certain training. And I think from that, you can say, look, Congress knew how to talk about training. If Congress wanted training, they knew the words and they knew how to say it. I thought that was in the reg, not in the statute. I believe that if you look at the statute itself for 1352, where it talks about with respect to, I think it's 1357 G2, I believe it is in the actual statute, Your Honor. Give me a minute. I'll find that. But yeah, it's 1357 G2. It's in the statute, Your Honor, not the reg. I think you're thinking of the regulation where it speaks to certain individuals that have to have... Right. So that's speaking to federal individuals who act as immigration officers under the regulation. So individuals that would have to have certain training. I think what Judge Pillard is asking about is 1357 G2, which is the statute. And it speaks to training that certain state officials have to have. And so my point was that when Congress wanted to enforce or require certain training, it knew how to say that. And it did not say anything about that when it issued, for example, other delegatory powers to the attorney general to make delegations speaking to that. But I would also make one other point to your point, Judge Pillard. If you look further down in 1357 to section G10, that's a provision that says that outside of this quasi-contractual relationship spoken to in G2, it says that state employees may cooperate with ICE in the apprehension and detention of removable noncitizens. And it doesn't say anything about training there. So it seems like what Congress may have been saying is if you have some sort of contractual relationship, then there has to be this training. But if you're just talking about cooperation... But that may be passing information, for example. That does not at all imply that a state officer who does not have knowledge of and adhere to federal law-related functions of these officers or employees could, for example, serve an I-200 and make an arrest. And I think the same statute seems to suggest otherwise. If you're going to make an immigration officer in that regard, you'd be subject to the regulations that Judge Ginsburg mentioned. I think, and I apologize if I don't have the full statute in front of me, but I think 1357 G10 does speak to apprehension and detention, or at least alludes to that. And so I think that there is this notion that Congress... Communicate with the attorney general regarding, this is 10A, regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States, or otherwise to cooperate with the attorney general in the identification, apprehension, detention, or removal of aliens not lawfully present, which one way of reading that is that you're cooperating by helping the attorney general to apprehend or the secretary of homeland security's staff to actually do the apprehending. I mean, that would be a way to- I think, I take your point, that would be one way to read it. I think another way to read it would be that it includes references to apprehension and detention. But again, that has to do with state officers. It's not what I'm briefing. And I just, I didn't remember to say to you that I was saving time for rebuttal, although I did say it to your- But G10 also relates, or at least, yeah, to state or political subdivisions. Yeah, state. So how does that, what are you saying about that, the reflection anyway on the training requirement for federal, for the marshal service? I was just making the point, your honor, that it seems that Congress knew how to speak to training. And so when you look at, for example, 1226, and Congress speaks to a warrant of the attorney general, and then if you look at the regulation for 236.1, which is the regulation implementing section 1226 that identifies that warrant of the attorney general as the I-200, which is the warrant in this case, nowhere in section 1226 does Congress say, and upon executing these warrants, there has to be some sort of training. And if you look at 1101A18, where Congress defined immigration officer, Congress did so and said it could be somebody, an employee or class of employees designated individually or by regulation. So there's the word or there. And I think if Congress wanted to say, but in case one, there has to be training, I would just point to 1367 and say, look, Congress knew how to talk about training, and there's no indication that Congress was doing so. I had some other points, but perhaps I should save my one minute for a rebuttal, your honor. Our practice in this court is that we will give you time as long as we find it useful to keep asking. We've been hearing from you, so it tends to be a good sign if we're finding your colloquy with you useful. And we will endeavor to give you also some time for rebuttal. So would the marshals be able, on your theory, to make the arrests and detentions in question if there were no I-200 forms involved? I think that's a closer question. Our position would be yes, that the detainer itself provides probable cause. And I think that there could be arguments to be made that under common law doctrines like fellow officer rule and such, there is authority for the marshals to hold somebody also under law that exists concerning wants and holds, which is other areas that we did brief before the district court on summary judgment. But to be fair, we did not preserve those arguments for appeal, and so I'm not making those arguments here. So the I-200 is directed at immigration officers that are authorized to serve an I-200. I think that that's right. I mean, our position is that the 2002 delegation, and again, we can talk about the 1996 and the 2002. I think the 2002 can be viewed standing alone. I don't think it depends upon the 1996 delegation. So just viewing the 2002 delegation on its own, it imbues the marshals with the authority to act as immigration officers. And when you talk about, well, was that authority permissive? I think you can look back at both. You can look at 510, Section 510 or 1103A4 that gave the attorney general the authority to make delegations. And when you look at the definition that Congress assigned to immigration officer in 1101A18, it says that that position can be bestowed either by regulation or there is a parallel track, and that parallel track is delegation. And so that's the track that we come to the court saying that these marshals were imbued with this authority. And when it's just the ICE that's doing it, is an I-200 something that is considered to have to be personally served? ICE does serve the I-200, and that is by regulation or requirement, I believe, on ICE. In this case, I believe we did file the I-200, and there is a service signature on it. It's the ICE officer that, I believe, serves that, not the U.S. Marshal. And that was attached to a brief in this court? Yeah. I concede it's perhaps not the best look of all time, but the PLEs want to frame the issue in this court as whether or not the U.S. Marshals had authority to detain NS and the other class members without a warrant. But that's not the issue here because it was never the issue below. Now, I wish I could tell you why that I-200 was not included within the appendix below. I didn't handle the appendix below. Unfortunately, the attorney who did is no longer with the U.S. Attorney's Office, and the individual who certified the administrative record is no longer with the Marshal Service. And even if I spoke to them, I couldn't reveal privileged communication. So I can't tell you that, but I have to believe that it was an oversight or an accident at some point in time. There was never a dispute below as to whether or not there was an I-200. The PLEs argued repeatedly and successfully to the district court that an I-200 is not a true warrant. The district court accepted that position. We obviously disagree with that, and there's cases out there like Abel that we've cited to in support of our disagreement. But the district court accepted that there was an I-200. The district court in writing about section 0.111 noted that the I-200 is not addressed to the U.S. Marshals. It's addressed to immigration officers. There was a whole, there was briefing on that. So I really think this ship has sailed in terms of a waiver doctrine in terms of whether or not we should be debating now whether or not there was an I-200. But I- In your brief on this, you invoked the presumption of regularity. Yes. Nothing you've just said, but just presumption. I mean, we did invoke the presumption of regularity. I think we also noted that there below, that had it been raised below that, look, this document is missing from the record, it would have been fixed. It was never raised below. I can't speak to why. I wish I had more information on that myself. It's one of the first things I noticed about the case. Your point about the district court proceeding as though this were not an issue at all. Yes. Well, I believe I did say that in the papers, that the district court proceeded as if it was not an issue because when we talk in the brief about section 0.111, I think we addressed the fact that the district court said that the I-200 is not, it's not addressed to the marshals. And the district court discussed the fact that it's not a true warrant because it's an administrative warrant and not a judicial warrant. And then we cited ABLE and we said that that's not correct respectfully to the district court. And so I think the issue, I think we did say below that the district court accepted that there was an I-200 in this case. Whether warranted or not, I have a question about the training. In your brief, you say nothing in the language of the regulation 287.5 purports to award exclusive authority over these arrested detentions to the listed agents and officers. But isn't that answered by the regulation 236.1B1, which says a warrant of may be served only by those immigration officers listed in 287.5B. And that list does not include United States marshals. Yeah. And I take your point. And I think the issue there is that at the time that the attorney general delegated authority to the INS to issue regulations, like the regulation you're talking about in this case, he reserved for himself all his powers. And that's at 23 Fed Reg 9117, 9118. And that's back in 1958. And he noted that the delegation to the INS was made without divesting the attorney general of any of his powers, privileges, or duties under the immigration and naturalization laws. And that includes by congressional approval, the right to make delegations under Section 1103A4 and 28 U.S.C. 510 and U.S.C. 1101A18. And so I think if you took the argument regarding 236 to its logical conclusion, then the attorney general could never delegate authority to make the immigration arrests to anyone. And it would nullify the initial reservation of rights. Well, then I think your argument is that the orders, 1996 and 2002, rendered the marshals for these purposes immigration officers. And that would then empower them under these regulations to make the arrests. But then you have the problem that they're not trained as immigration officers who do this, must be trained. Well, I think, and I take that point, and that's an argument. And they're different, which they're not authorized to do these activities or they're denominated for limited purposes immigration officers, in which case one would think they have to act as immigration officers, just like the state officials have to act. Well, to the state official point, I think there are circumstances where they have to undergo the training and others where they don't. But to your point, I think our argument is that there's nothing inherently inconsistent about having regulations apply to people who are subject to those regulations. These are INS regulations. Marshals are not a part of the INS and that there's nothing inconsistent. But that's a problem for you, not a benefit. So you effectively, let me step back and ask you, without grandfathering the authorities granted by the 1996 and 2002 orders of the attorney, attorneys general, how would the government go about accomplishing this task without posting an ICE officer at the Superior Court? What is the authority, if this were to happen today, as opposed to through pre Homeland Security Act delegation? How would you set this up? I'm not sure I understand the question. So when ICE learns that an individual, and stop me if I'm not answering the question you're asking, but when ICE learns that an individual is going to be released from custody, they would send somebody in a perfect world to the courthouse and wait for the reality of this world is that there's not enough ICE officers, particularly in certain districts more than others, to stand outside of courthouses all day, particularly with delays that might be occasioned by someone's trial calendar ran long or other realities of the courthouse. And then they would pick someone up and the risk that you have. No, I understand that. And it's true with state courts generally. I mean, DC is a special case, state, federal, but generally, it's true. And there is some provision in statute for working that through. So assume that we rule against you here, what next? I mean, I think if you ruled against us... The Attorney General issue a new order? Yeah, I mean... Would it have to come from the Secretary of Homeland Security? I think it would have... Deputizing a marshal to... I mean... If you ruled against us, it would have to... Most likely, and I don't want to bind us, but I believe it would most likely have to come from the Secretary of Homeland Security. And I do think that could probably be fixed fairly simply with a delegation which perhaps addresses some of the concerns raised here. Pardon me. If the disagreement with you relates to the training, then why would it not be an option for the Attorney General to provide the training or for someone to provide the training? It might be. I mean, those decisions would be above my pay grade, Judge Ginsburg. I suppose one option would be to provide the training if that were the issue. I suppose another option would be to correct or to modify the order. Because as you know, the court below had issues with Chenery, which I haven't touched upon and we don't think is an issue. But if that was something that this court found problematic, again, that would be something else that then would have to address outside of just the training. So, I mean, I do think that if you rule against us, it's not that the issue can't be fixed, but that the government has made a choice to defend what's taken place and that there's no necessity to do anything beyond stand behind the order that was issued. I did... Sorry. No, go ahead. I was just going to say, I did want to just say one last thing to Judge Pillard, which was that we view nothing inconsistent about having a delegation that can run parallel to regulation such that individuals can be designated by delegation who may not be susceptible or encumbered by or required to abide by training requirements and other individuals who are designated by regulation might have to be. And again, we look to 1101A18. So, I was just going to close the loop on that, but Judge Walker. I was going to ask you about 1252F1. Yes. Which you had mentioned and we haven't really discussed that the marshals are not mentioned in section 1226 or 1231 or implementing regulations. And I just wonder what your theory is of how the injunction in this case enjoins or restrains operation of those statutes or any of the other statutes within the series that is referenced in 1252F1. Well, in Alman Gonzalez, the Supreme Court made clear that when the statute talks about the operation of the covered provisions, it's referring to not just the covered provisions themselves, but how the government chooses to carry them out. And so here, the covered provision that we would be section 1226. 1226 references and its text on a warrant of the attorney general. The regulation makes clear that that warrant is the I-200. The way that ICE carries out and implements section 1226 is with reliance upon the U.S. marshals. And again, it's a necessary reliance based on just the reality of how many ICE officers there are and what's necessary to someone up. Not only that, you have concerns about safety, the difference between picking up an individual from the custody of a marshal. We have no reason to question the policy reasons. So on your view of section 1252F1, it bars class-wide injunctive relief or non-individual injunctive relief against any agency purporting to act pursuant to the specified INA provision. So if the National Park Service rangers began making immigration arrests and detentions and said, hey, no injunction against us, the district court, on your theory, would be precluded from entering an injunction to stop that on a non-individual basis? I think it would be a closer question if it was the National Park Service, if it was the EPA, if it was the post office. But that's not this case. So give me a principle why that would be different. I mean, as a principle, I think yes. If ICE were, for some strange reason, relying upon the New York Forest Service or the Postal Service to do this, and that was their policy, and they could articulate a reason why that could possibly make sense, then yes, 1252F would bar it as a principle. Do I think it presents more difficult questions? Yes, I think it presents more difficult questions. It's more difficult because it's ultra-virus or it's some kind of exception to the remedial strip that 1252F1, I mean, I'm really seeking your help here because I read Alman Gonzalez also to be very broad, and the colloquy between the majority and the dissent about the operation of the law, where the dissent says the operation of the law has to be like the law, not illegal. And the majority says, no, laws can be operated illegally just like vehicles can be, which to me would suggest that if the National Park Service is operating this statute, that a court could not enjoin it. But that feels like a pretty strong medicine. Yeah, I mean, as you said, the majority in Alman Gonzalez says that the prohibition from 1252F applies to any action that requires the government to refrain from actions that in the government's view are allowed, and that means that if the government is misinterpreting and misapplying a statutory provision, it's still covered by the ambit of 1252F, and that means that it's not to laws as properly interpreted. And so based on the hard letter, the black letter, excuse me, of Alman Gonzalez, I would say, yes, there is an argument, a strong argument, probably the stronger argument to be made that the EPI or the Park Service could be protected by it if it is cooperating with ICE under the covered provisions. I say it's a closer question, not because I am able to draw for you what the limiting principle is, but just because the gut reaction is, oh, the Park Service is doing that. That's why I say it's a closer question, but it's not this case, and so I don't think that we need to find what the ends of the limiting principle are. In this case, the cooperation, I think, does make sense between two different law enforcement agencies. 1226 talks about a warrant of the Attorney General. This is how ICE implements Section 1226, and the court sought her and joins it. Plaintiffs sought, banked her, and declared her judgment as so if we were to agree with you on the bill of 1252 F1, the appropriate course would be to remand for the district court to consider whether there's remaining relief. I think I would disagree with that. First, I would say, and now I'm afraid that I'm wrong, but I don't believe that the plaintiffs did seek banked her. I believe they also sought declaratory relief. I could be mistaken, but I don't recall there being banked her, but to speak to both points regardless, I would first say banked her is not really a remedy that makes sense in this case, because when you talk about banked her, you're typically talking about a policy rulemaking or adjudicatory action. I mean, here, the only thing that could possibly be vacated would be the 2002 and 1996 orders, and if that could be vacated through the action of a single member of any individual person, it sort of raises a question of what purpose does class certification serve, and so our position would be that banked her is not available, and it also wouldn't be available for the reasons that were discussed, I believe, when the solicitor general was arguing. What's that? What about declaratory relief? I think declaratory relief that functions like an injunction would still be barred by section 1252. I think it's harder to draw where that line is. I mean, I think the government's position in the supplemental briefing in maybe Arizona v. Biden might be getting the wrong there, but the one that was a couple of weeks after Haldeman-Gonzalez, I think they said 1252 F-1 blocks out injunctions, and it blocks out vacated her, but it doesn't block out most declaratory relief. I think that's right that it doesn't block out most declaratory relief. I think the government's line, the solicitor general's position would be that there is probably room for certain declaratory judgments, and there probably isn't room for others if a declaratory judgment acts like an injunction, and I would just point the court to Hamama v. Aduchi, which is 912 F-3 869, which is a 6th Circuit 2018 opinion by Judge Sutton. We don't have Supreme Court law on this with respect to the declaratory judgment. I think that there is a line to be drawn. I can't tell you where it is other than that. That very statement makes me think we would probably be best off letting the district court consider it before we decide it ourselves. I mean, that would be one way that the court could proceed, but I would just note that in this case, it seems as though any declaratory judgment that would be issued would be really a distinction without a difference to some extent with an injunction. I mean, expecting that the government does comply with, would comply with declaratory relief if the court found something to be unlawful, and so we would ask that this court, you know, if this court issues judgment on the merits, which we could also ask that the court do, there'd be no reason for that remand in the first place. And I ask you to help me think through an argument we haven't, an issue we haven't talked about yet, which is if the plaintiffs are right on the merits and if they're also right about 1252F1, you still have the argument that there's no irreparable harm here because I guess you're not irreparably harmed if you're detained by someone who's not allowed to detain you so long as you could be detained by someone who is allowed to detain you, and I am pretty skeptical of that and give you an opportunity to address my skepticism. The hypothetical I'm thinking of that I have found helpful is, imagine I have a mortgage with PNC, but Bank of America forecloses on my house. Seems like if, you know, if they get an order to take my house, I've been pretty irreparably harmed, even if, you know, PNC would have been able to get an order to foreclose on my house. I take your point, and I admittedly haven't looked into any of what the foreclosure laws are in this country, nor am I familiar with that area of law. It's not a property law point I'm making. It's just a general principle that, you know, if somebody is, like, harming me in a way that I'm not going to be able to get back my injury, that seems like irreparable harm, even if maybe someone else would have a right to inflict the same injury. I think with respect to deprivation of liberty, it's not. And, I mean, obviously, I can see that I've looked at the cases we cite, too, our Section 1983 cases, but there are a plethora of 1983 cases throughout the country which come to the holding that if there is a cause for detention by one law enforcement agency and someone, for example, is not transferred on the day. If someone had been kidnapped by a private citizen, would that be irreparable injury? Well, I think that there'd be, I think that would certainly be a tougher case for me to argue, but, I mean, it's not the case that's here. I mean, here we have two law enforcement agencies that were working together. I mean, you can look at the wants and holds cases throughout, you know, throughout this country. And, again, it's not an argument we preserve for appeal, but law enforcement agencies throughout the country, before they release someone, will look up wants and holds and say, is there another agency that this person's wanted for? And then they may hold that person for an hour, two hours, until there is coordination. And so I don't think you would say that there's been a deprivation of liberty in those circumstances. And if you look at the 1983 law across the country, if you have somebody who is in, you know, custody in one state and there's extradition to another, and the extradition order is supposed to be executed by the 30th day, and for reasons that no one understands, the extradition order takes place on the 31st day. There have been 1983 actions for Fourth Amendment violations and for Fifth Amendment violations, and the courts have, I've looked at the cases, I've looked at the courts, have said, no, there's no deprivation of liberty in those circumstances, because whether you're being held by Connecticut or the neighboring state of New Jersey, you would have been held regardless. And I think that that is the closer analogy to this circumstance than the mortgage situation that you've noted. If there's no further questions, I would, I had reserved three and a half minutes for rebuttal, if the court will allow me to have any rebuttal, I'd appreciate that. We will allow you to have rebuttal, and we'll hear now from Mr. Jonan. Jonan? Good morning, may it please the court, Daniel Gounan on behalf of NS and the plaintiff class. I do want to address a couple issues about the full warrantless warranted arrest issue. But before that, I want to focus on the key reasons why the U.S. Marshal Service do not have lawful authority to detain or arrest people based on civil immigration violations. The first is the Accardi principle, which is the principle that the government is bound by regulations. In this case, we have regulations that say only a specific list of designated immigration officers who have undergone required training are allowed to serve I-200 warrants or make warrantless arrests. It's undisputed that the marshals are excluded from those lists. Second, the termination of the marshal's delegated power when all of immigration enforcement authority was transferred from the Attorney General of the Department of Justice to the Secretary of Homeland Security and the Department of Homeland Security under Laurel Bay. That transfer terminated by operation of law any prior delegations by the Attorney General and certainly was superseded when the Secretary of Homeland Security issued a comprehensive set of regulations specifying exactly who could exercise these powers. And finally, the Chenner doctrine, which is the principle that the 2002 order that the marshals are relying on really can't be read to confer the specific power to make arrests for suspected civil immigration violations. So as I understand it... Because it doesn't recite the correct authorities, the 509-510 argument? That was good enough for the district court judge. We've kind of expanded on that on appeal. And it's really... The way I would say it is the fact that the 2002 order doesn't cite the INA's delegation authority is one piece of evidence that calls into doubt the whole notion that this was a delegation of authority to make routine civil immigration arrests. The order doesn't talk about serving a warrant. It doesn't talk about a warrantless arrest justified by likelihood of escape. It doesn't talk about probable cause. It says you may locate and apprehend someone who is in violation of the immigration laws. So if you contrast that language to the language that's in the regulations delegating arrest power to immigration officers, it seems like two different things. Well, the 2002 order specifically talks about immigration arrests, doesn't it? It talks about locating and apprehending people who are in violation of the immigration laws. So not people for whom there's probable cause to believe that they are... Or reason to believe, as I believe the regulation puts it. So it's different language. And it doesn't say anything about warrants. It doesn't say anything about in the absence of a warrant, there's a statutory requirement that the arrest be justified by likelihood of escape. It seems to apply to fugitives, which is why it uses the terms locate and apprehend, which are typically done in these fugitive apprehension programs. And the marshals have separate statutory authority to participate in fugitive apprehension programs as directed by the attorney general. Now we know what the attorney general had in mind when he issued this 2002 order. We know from the accompanying memo that it was the NCERS program. Which wasn't about fugitives at all. Well, it was not defined in terms of fugitives, but it was used as a fugitive apprehension program. I believe John Ashcroft gave congressional testimony where he talked about how they had captured hundreds of criminal and terrorist suspects pursuant to the NCERS program. So, I mean, the language of the order is admittedly strictly limited to the NCERS program, but that's what the attorney general had in mind. And we know, or at least we have strong reasons to believe he didn't have in mind the practice the marshals are doing in Superior Court. Because the order doesn't talk about any of the things you would expect it to talk about. If he was trying to amend the regulations that say only these people can make these arrests, it would say notwithstanding the authority delegated in 8 CFR 287.5 C1, the following U.S. Marshals and Deputy U.S. Marshals are authorized to make, are authorized to serve I-200 warrants. Now, he couldn't even delegate the warrantless arrest power because by statute that can only be delegated by regulation. You can test that there was an I-200 warrant for NS. I do not contest that there was an I-200 warrant for NS. I contest that it has legal significance for several reasons. Number one, we don't know when it was issued. We know, I'm sorry, we know it was issued on January 14, 2020. We don't know what time it was issued. We don't know if it was issued before or after the marshals NS had been ordered released by the Superior Court and the marshals detained him. We know it was served by an ICE officer in Lorton, Virginia, later that day. So when it was issued, we simply don't know. I think we can infer from the record that the marshals, whether the warrant existed, the marshals were not aware of it because it's not in the certified administrative record prepared by the marshals and their own policy says, I believe it's on JA-45, that they will try and get the copy of the paperwork. So presumably if the warrant exists and they tried to get it, they would have had it in the administrative record. Let me ask you a question about this related to this. Sure. Does the district court's injunction cover class members for whom there are I-200 warrants that marshal service was aware of, that were served properly, that the timing was all the T's dotted, all the T's crossed and all the I's done? Yes, it does. If we decide that 1252 F-1 bars the class-wide injunction, would the district court be able to enter an injunction just to NS? And I think part of what I'm thinking about is mootness. I don't want to concede that it would be moot because I can imagine circumstances that wouldn't be moot. For example, imagine, I'm not saying this is true, but imagine there were a pending superior court warrant for NS such that it was foreseeable that he would be arraigned in superior court next week or something, that it might not be moot as to NS. Is NS in the country? I actually don't know the answer to that. I can tell you he was released by ICE at some point, but I don't know the status of his immigration matter. But the release was at a pretrial stage, was it not? So presumably he's due back. I believe his superior court case is terminated. Okay. But certainly at the time... At the time it was filed, he was in custody at the superior court. And so he had standing because it was an ongoing detention and he had a likelihood of reappearing at the superior court because he was being prosecuted there. That's right. He did have future court appearances. I mean, I assume the court could take judicial notice of the superior court docket that shows he did, in fact, make subsequent court appearances. And just to be clear, I'm not so worried about whether there was a mootness issue when the order was issued. I'm imagining, and I know you don't want us to vacate the conjunction, but if we did, what would happen then? And I guess, why was it terminated? To the extent that this isn't the publicly available record, why was the superior court case terminated? My understanding is that he took a plea. Okay. And served probation. And then you said you don't know if he's in the US. Do you have to be in contact with your client in order to be representing him here today? Well, I represent the class. So he's the name. You don't have to be in contact with the class representative? That's not a rhetorical question. I'm genuinely asking. To be honest, I don't know the answer to that. I personally have not been in contact with him. There are other people at the Public Defender Service who work on this case who may have been in contact with him. If I may, I want to ask about the forfeiture issue on the 1252 F1 issue. Imagine that it is something that could be forfeited and imagine that, and it quite clearly was not preserved in a way, in an ideal way. But imagine I don't think it's waived. Imagine we're talking forfeiture now. There are exceptions to when we would enforce forfeiture. And the briefing covers a couple of them. I wonder if another reason to excuse forfeiture is a public safety reason. And I'm thinking if lives will be in danger because people with criminal records who the executive branch wishes to detain and has the resources to detain are not being detained because of a class-wide injunction. If that kind of public safety factor should be a reason to excuse forfeiture. Well, the government hasn't made that argument, but to sort of address it, every member of our class is, I guess, by definition, someone for whom a Superior Court judge has said, you are not a danger to the community. You can be safely released in the community pending whatever you're charged with. Or other members of the class or people who the U.S. Attorney's Office has said, has looked at the arrest paperwork and said, we're not charging this person. This person shouldn't even be charged with a crime. So I don't think there's a strong, I don't think the record would support that kind of a public safety rationale. Um, and I don't think it's, I think it's, I think that's a strong, a strong response to that. Okay. But, but imagine that I think, well, the executive thought this person was dangerous enough. I get that the Superior Court judge didn't, um, you know, uh, imagine, I think that there's some public safety, uh, I imagine, I think that there is some risk to public safety if this injunction goes forward. Is that a fair thing for, for the court to consider in whether to excuse forfeiture? Or is that just off the table in terms of factors we should consider? I think it would be too much to say it's off the table. I mean, I think probably the court can consider anything it wants to consider in deciding to, anything supported by the record, at least in deciding to, to, um, excuse a party's forfeiture. Um, you know, of course the injunction doesn't prevent anyone from being arrested or detained by ICE. It doesn't prevent that. And, you know, ICE, it doesn't even prevent the marshals from doing it under a certain set of circumstances that could happen in the future. Uh, and, and I think the parties are, are basically in agreement that the difference between class-wide injunctive relief, which arguably is barred by 1252 F1 and class-wide declaratory relief, which until today, I think the government had conceded is not barred by 1252 F1. And this court has said is not barred by, um, 1252 F1. We all agree there isn't really much of a difference at the end of the day. So the public safety rationale, you know, doesn't come into play. The marshals, I think, I think Ms. Feudham basically said, they're going to comply with the declaratory judgment. So the policy is going to be the same. That is in a little bit of tension with what the solicitor general said, um, about declaratory relief in the supplemental brief that I mentioned earlier. And, uh, you know, I, I take Ms. Feudham to speak for the Department of Justice today, uh, but, but I also take the solicitor general to speak for the Department of Justice. Sure. And I, I guess because this case only involves the marshal for the Superior Court of the District of Columbia, even if it were not a class-wide declaratory relief, even if it were just a declaration that detention of a person under these circumstances violates the law, I mean, the, presumably the marshal service would, would comply with that. But then that does run into the possible mootness. It does run into the possible mootness issue, which I think what we're, maybe what this is pointing to is, is all the reasons we've cited why the court, assuming it is forfeited rather than waived, shouldn't exercise its discretion to reach the issue. There are a number of issues that, legal issues that would arise only if the court chooses to excuse, uh, the forfeiture that would not, the court would not need to reach those issues if the court holds the government to its forfeiture. Um, we've cited, you know, the prejudice to the class, and it's not really within the policy of 1252 F1. And, you know, whether we, I understand, you know, looking at legislative history to interpret what a statute means is controversial, but looking to what the statute's purpose is to decide if we should excuse a party's forfeiture and rely on that statute, I think does make sense. And the, um, congressional history, the house report that's cited in the NIJC brief, amicus brief, uh, makes it very clear that, uh, Congress didn't, didn't want to prevent, uh, litigation about the legality of arrest and detention. They left all these avenues open, including injunctions, just not class-wide injunctions. And the legislative history makes clear that they, they wanted these things to be litigated. They just didn't want, you know, one district court issuing a nationwide injunction that's going to stop the whole, you know, systemic system from operating while the litigation plays out at various levels. I don't think they love the idea of statewide injunction either. Well, this, this is one court. It doesn't even apply in, in all of the district of Columbia. It doesn't apply to the marshals and the federal district court. Um, so it, it really, the only, you know, uh, Robert Dixon, the named defendant is the only person and his deputies are the only entity affected by this. Um, unless the court has any further questions, um, I see my time has expired. I'm just, uh, making sure there aren't questions I wanted to ask you before you sit down. Thank you. Hello again. Um, I I'd like to start by just speaking for a moment about the 1252 F1 that were raised. Uh, 1252 F is a jurisdictional statute. It divests the court jurisdiction or authority. And I think in their papers, the appellees drew a distinction or perhaps confused, I should say subject matter jurisdiction, which we don't contest with jurisdiction to issue a particular remedy. And it's clear from looking at the Texas v. Biden case, that the statute does contain a jurisdictional divestment from the federal courts. And in fact, if you look at, uh, also, I believe there was a fourth circuit case that we cited in our papers, Miranda v. Garland, uh, from 2022 founding finding that the government did not waive arguments under 1252 F1 by failing to raise it in the district court, because as a jurisdictional limitation, it's not subject to waiver. I would also note that at the time this case was litigated, before the district court, but the U.S. attorney's office, Elman Gonzalez had not been decided yet. So the scope of 1252, um, and it's, it's particularly expansive scope had not been carved out and set forth with such specificity by the Supreme court. I'd also like to note that 1252 F1 doesn't say that if the class is a narrow one, or it only affects a county or a particular, uh, geographical range of society, then the, then, then the prohibition is somehow waived. 1252 speaks to class-wide injunctions. And this case clearly falls under that. Um, I also wanted to respond to something that Mr. Gonan said about, we can fairly infer that the marshals were not aware of this I-200. I just don't think that that's fair to say. I concede it was not part of the record, but I don't think we have any indication as to why it was not part of the record, what the marshals as an institution were aware of in 2020 or 2021, when this case was litigated, what some point of contact pulled out of a file versus what the marshal who executed this warrant, um, at the time was aware of. I just don't think we can draw any conclusions from that. All we know is that it does exist right now. Mr. Gonan has conceded it existed. And at the district court, it was always litigated. Um, and the last point I just wanted to make briefly was regarding, uh, Chenery because we really didn't get to speak to it at all, um, when I was up here before, but the, the rubric of Chenery doesn't require that every single statute that provides authority for a particular action be cited. Um, so when you have a statute like 28 USC 510 and 8 USC 1103A4, which provide coextensive authority for delegation, there's no authority or precedent that would require the attorney general to have cited to both. I know the district court pointed to the Giordani case and said that there was, um, a problem there with the fact that the attorney general cited to section 510 with respect to a wiretapping delegation. But there, the issue is that there was a competing statute, which limited the delegatory authority for wiretapping here, section 510 and 1103A4 are not intention. And it would also just be our position that Chenery doesn't apply in the first instance, because this is not a question of discretion of policymaking of fact finding of an area where the agency has sole expertise. This is simply a question, a legal question. Did the attorney general have authority to act? And for the government's brief, the answer here is unequivocally yes. We would ask that this court overturned. I suppose it could be a policy decision not to invoke a particular authority. I suppose in circumstances, perhaps it, uh, could be. I know that there was, uh, the media, the media case out of the circuit, which I believe you were on the panel for many, many years ago, where there was a discussion as to, uh, whether or not the communications act or the reform act was invoked because it had to do with jurisdiction of appellate issues. And perhaps in a case like that, there might be, but because depending on which authority was invoked, there was a different path to review. In this case, there, you know, imaginable policy reason to invoke 510 over section 1103, because it doesn't lead to a different place. There's no distinction in terms of review. They both provide the same level of delegatory authority. Um, and focusing back again on the media case from, um, this circuit, uh, an agency's power is neither widened. 2002, that authority is picked up, correct? Say that again. I'm sorry. The authority, you say they're both delegations or authority is the same in two different sources. So it doesn't matter which one you see. But then in 2002, the second source is invoked. Isn't that correct? In 2002, they cite to, uh, 510. And in 1996, they cited to the attorney, the deputy attorney general, she cited to, uh, 1103. Uh, and so our, my position is that it doesn't matter. I mean, my position would be, it doesn't matter if either one is invoked because the attorney general has authority to make subdelegations and that the attorney general could have invoked nothing. I mean, the delegation starts with the 2002 delegation starts with by the inherent authority, you know, by my inherent authority, including, and then he also lists by my authority as attorney general. I I'm, I don't want to be, I'm not quoting, but it's something to the effect of referencing the inherent authority. So our position would be could have cited nothing because Chenery doesn't apply whether or not the attorney general has that authority is a legal question that either he has it or he doesn't. And even if he did have to cite something, he could have cited either one. It doesn't make a difference. But the, I mean, the difference is that 509 and 510, which the 2002 order does expressly say are about general attorney general authorities. And what is it? 1103 is about, you know, INS authority, INA authority. Yeah. I mean, I take your point that it's more specific, but it's more specific in a nature that there's no tension between the two. Well, there is in the sense that what kind of aid, you know, is the attorney general rendering the marshals immigration officers, or is it saying as marshals doing the things that marshals do, you should help out. And I mean, there's a lot of, there's a lot of difficulty in attempting to grandfather something that was, you know, purpose built for a very different problem. Well, I mean, I think we don't really know, you know, what, I don't know that we can say that the language in the 2002 delegation is narrow enough to that is so narrow that it applies only to the NCRS. I don't think that's the case. It's broader language. I don't think that 1103A4 and 510 are in conflict is one more specific. Sure. I take your Giordano argument. I do think that that doesn't quite cut it. It's not a limitation that the invocation of the broader authority is somehow overbearing. Yeah. Well, I have nothing further. The court should, should overturn and vacate. Thank you. Thank you very much.
judges: Pillard; Walker; Ginsburg